## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:                                                                    **CHAPTER 11**
**PREVALENCE HEALTH, LLC**                          **CASE NO. 0902016EE**

**H. KENNETH LEFOLDT, LIQUIDATING**
**AGENT FOR PREVALENCE HEALTH, LLC**

**VS.**                                                      **ADVERSARY NO. 1100068EE**

**MICHAEL L. ANTHONY**

Hon. G. Todd Burwell                   Attorneys for H. Kenneth Lefoldt, Liquidating
Hon. Jacqueline H. Ray                      Agent for Prevalence Health, LLC
618 Crescent Blvd. Ste. 200
Ridgeland, MS 39157

Hon. Douglas C. Noble                        Attorneys for Michael L. Anthony
Hon. Sean R. Guy
602 Steed Road, Ste. 200
Ridgeland, MS 39157

Edward Ellington, Judge

## MEMORANDUM
## OPINION ON THE *MOTION FOR SUMMARY JUDGMENT*
## *BY H. KENNETH LEFOLDT LIQUIDATING AGENT FOR PREVALENCE*
## *HEALTH, LLC* AND *DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

**THIS MATTER** came before the Court on the *Motion for Summary Judgment by H.

Kenneth Lefoldt Liquidating Agent for Prevalence Health, LLC* (#22) and  *Defendant's Motion for

Summary Judgment* (#26) filed by Michael L. Anthony.  Having considered the motions, the

respective briefs and other related pleadings filed by the parties, the Court finds that the *Defendant's Motion for Summary Judgment* (#26) is not well taken and should be denied and that the *Motion for Summary Judgment by H. Kenneth Lefoldt Liquidating Agent for Prevalence Health, LLC* (#22) is well taken and should be granted.

## FACTS

Prevalence Health, LLC[1] (Debtor) was a provider of medication and disease management services and also operated a home delivery pharmacy. Michael L. Anthony (Anthony) was the president and chief operating officer of the Debtor from November 2004 through January 2010. During this same time, Anthony was also a member of the Debtor's board of directors.

On June 9, 2009, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. According to the Debtor's *Disclosure Statement for Debtor's Chapter 11 Plan* (#167) (Disclosure Statement), which was filed in the Debtor's main case, and as Anthony testified in his deposition,[2] the Debtor filed bankruptcy because

> [t]he financial performance of the Debtor continued to decline during the period from June 29, 2007, until the Petition Date. The Debtor sought various acquisitions and combinations to increase its customer bases and to expand its operations, but none were successful. . . .None of the Debtor's efforts to recapitalize and grow or to sell its business have been successful, and the Debtor was not able to raise sufficient funds or acquire strategic partners or a sufficient client base for the [Debtor].[3]

---

[1]Prevalence Health, LLC started out as Health Alliance. Health Alliance subsequently changed its name to Prevalence Health, LLC. For purposes of this Opinion, the Court will use the name Prevalence Health, LLC.

[2]*Transcript of Deposition of Michael L. Anthony* at 8-23, Exhibit A to *Motion for Summary Judgment by H. Kenneth Lefoldt Liquidating Agent for Prevalence Health, LLC.* (#22), (Adv. Case No. 11-00068EE), March 14, 2012 (hereinafter, Transcript of Deposition).

[3]*Disclosure Statement for Debtor's Chapter 11 Plan* (#167) at 13, (Case No. 09-02016EE), May 7, 2010.

On August 4, 2010, the *Order Confirming Debtor's Amended Chapter 11 Plan* (#203) was entered. Pursuant to the confirmed plan, H. Kenneth Lefoldt (Trustee) was appointed as the Liquidating Agent of the Debtor.

On June 7, 2011, the Trustee filed his *Complaint to Avoid and Recover Preferences* (#1) (Complaint). In his Complaint, the Trustee alleges that on January 28, 2008, Anthony paid the Debtor $125,000. The next day, on January 29, 2008, the Debtor executed a Promissory Note payable on demand, in which the Debtor agreed to repay Anthony $175,000 plus interest at the rate of 7% per annum. Subsequently, on February 28, 2008, Anthony paid the Debtor an additional $50,000. Anthony had now fully funded the total amount provided for in the Promissory Note, namely $175,000 (2008 Loan).

The Trustee further alleges in his Complaint that in or around August of 2008, Anthony made a demand for repayment from the Debtor. Then on August 29, 2008, the Debtor paid $175,000 to First Commercial Bank (FCB) in satisfaction of a personal loan obtained by Anthony to fund the 2008 Loan. The Trustee asks the Court to set aside this payment as a preference pursuant to 11 U.S.C. § 547[4] and to enter a judgment awarding him $175,000 pursuant to § 550(a).

Anthony denies that the repayment is an avoidable preference in his *Answer and Defenses to Complaint to Avoid and Recover Preferences* (#11) (Answer) which he filed on July 15, 2011. In his Answer, Anthony asserts among other defenses that the Debtor incurred and paid the 2008 Loan in the ordinary course of its business.

The Trustee and Anthony have filed dueling motions for summary judgment. On March 14,

---

[4]Hereinafter, all code sections refer to the Bankruptcy Code found at Title 11 of the United States Code unless specifically noted otherwise.

3

2012, the Trustee filed his *Motion for Summary Judgment by H. Kenneth Lefoldt Liquidating Agent for Prevalence Health, LLC* (#22) (Trustee's Motion). In the Trustee's Motion, the Trustee alleges that he is entitled to a judgment as a matter of law because there is no genuine dispute that the payment by the Debtor to FCB for the benefit of Anthony is an avoidable preference.

Anthony filed his *Defendant's Motion for Summary Judgment* (#26) (Anthony's Motion) on March 22, 2012. Anthony alleges that there is no genuine dispute that the transfer in question, the repayment of the 2008 Loan, was not a preference because it was made in the ordinary course of business pursuant to § 547(c)(2). Therefore, Anthony asserts he is entitled to a judgment as a matter of law declaring that the payment is not an avoidable preference under § 547.

The parties filed numerous briefs in support of their respective motions. The final reply brief was filed on May 2, 2012. The Court then took the matter under advisement.

## CONCLUSIONS OF LAW

### I. Jurisdiction

This Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(1) and (2)(F).

### II. Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure,[5] as amended effective December 1, 2010,[6]

---

[5]Federal Rule of Civil Procedure 56 is made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056.

[6]The Notes of Advisory Committee to the 2010 amendments state that the standard for granting a motion for summary judgment has not changed, that is, there must be no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law. Further, "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases."

provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment, "the court does not weigh the evidence to determine the truth of the matter asserted but simply determines whether a genuine issue for trial exists, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 106 S. Ct. 2505, 2510 (1986)." *Newton v. Bank of America (In re Greene),* 2011 WL 864971, at *4 (Bankr. E.D. Tenn. March 11, 2011).

"The moving party bears the burden of showing the . . . court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)." *Hart v. Hairston,* 343 F. 3d 762, 764 (5th Cir. 2003).

Once a motion for summary judgment is pled and properly supported, the burden shifts to the non-moving party to prove that there are genuine disputes as to material facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials."[7]  Or the non-moving party may "show[ ] that the materials cited do not establish the absence . . . of a genuine dispute."[8]  When proving that there are genuine disputes as to material facts, the non-moving party cannot rely "solely on allegations or denials contained in the pleadings or 'mere scintilla of evidence in support of the nonmoving party will not be sufficient.' *Nye v. CSX Transp., Inc.,* 437 F.3d 556, 563 (6th Cir. 2006); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith*

---

[7]Fed. R. Bankr. P. 7056(c)(1)(A).

[8]Fed. R. Bankr. P. 7056(c)(1)(B).

5

*Radio Corp.*, 106 S. Ct. 1348, 1356 (1986)." *Newton,* 2011 WL 864971, at *4. "[T]he nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause of action." *Malacara v. Garber,* 353 F.3d 393, 404 (5th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 106 S. Ct. at 1356 (citations omitted).

When considering a motion for summary judgment, a court must view the pleadings and evidentiary material, and the reasonable inferences to be drawn therefrom, in the light most favorable to the non-moving party, and the motion should be granted only where there is no genuine issue of material fact. *Thatcher v. Brennan*, 657 F.Supp. 6, 7 (S.D. Miss. 1986), *aff'd*, 816 F.2d 675 (5th Cir. 1987)(citing *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070-71 (5th Cir. 1984)); *see also Matshushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356-57, 89 L. Ed. 2d 538, 553 (1986). The Court must decide whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). On cross-motions for summary judgment, the Court must review each party's motion independently. *Ford Motor Co. v. Tex. Dep't Of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

### III. Preferences under § 547

In *Cullen Center Bank & Trust v. Hensley (In re Criswell),* 102 F.3d 1411 (5th Cir. 1997), the United States Court of Appeals for the Fifth Circuit explained the purpose of § 547:

In general, § 547(b) permits a trustee to avoid various preferential transfers of the

6

debtor's property made prior to the commencement of the bankruptcy case. Congress enacted this preference-avoiding section with two intertwined purposes in mind: (1) discouraging creditors from racing to the courthouse to dismember the debtor during his slide into bankruptcy, and (2) facilitating the prime bankruptcy policy of equality of distribution among creditors of the debtor.

*Cullen,* 102 F.3d at 1414. (footnote omitted).

Section 547(b) sets forth the preferential transfer requirements, as follows:

**§ 547.   Preferences**

(b) [T]he trustee may avoid any transfer of an interest of the debtor in property–

    (1)  to or for the benefit of a creditor;

    (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3)  made while the debtor was insolvent;

    (4)  made–

        (A)  on or within 90 days before the date of the filing of the petition; or

        (B)  between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5)  that enables such creditor to receive more than such creditor would receive if-

        (A)  the case were a case under Chapter 7 of this title;

        (B)  the transfer had not been made; and

        (C)  such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. §  547(b).

In order for the payment made by the Debtor on the 2008 Loan to be set aside as a preference pursuant to § 547(b), the Trustee must prove each of these five elements by a preponderance of the evidence. *T.B. Westex Foods, Inc. v. FDIC (In re T.B. Westex Foods, Inc.),* 950 F.2d 1187, 1190 (5th Cir. 1992); *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217, (9th Cir. 1988), *cert. denied*, 486 U.S. 1056 (1988); *In re Adbox, Inc.,* 488 F.3d 836, 843 (9th Cir. 2007); *Phoenix Restaurant Group,*

*Inc. v. Fuller, Fuller & Associates, P.A. (In re Phoenix Restaurant Group, Inc.),* 316 B.R. 671, 675 (Bankr. M.D. Tenn. 2004).

According to Anthony's Answer, Anthony does not contest that the Debtor paid FCB $175,000 on account of the 2008 Loan he made to the Debtor.[9]  Anthony also admits in his Answer that he was an insider of the Debtor and that the payment of the 2008 loan was made within one year of the filing of the Debtor's bankruptcy petition.[10]  In addition, Anthony admits the payment allowed him to receive more money than he would have received if the Debtor had filed a Chapter 7 bankruptcy.[11]  Therefore, Anthony has conceded four of the five elements of a preferential transfer under § 547(b).  As to the remaining element, Anthony challenged whether the repayment of the 2008 Loan occurred when the Debtor was "insolvent" under § 547(b)(3).

While Anthony's Motion focuses mainly on an affirmative defense, namely that the 2008 Loan was incurred and the repayment was made in the ordinary course of business under § 547(c)(2), the Court addresses the insolvency issue first to determine whether the Trustee has met all five requirements of § 547(b).  This task hinges solely upon an application of law.

## A.  Insolvency

In his Answer and in his pleadings in opposition to the Trustee's Motion, Anthony denies that the Debtor was insolvent at the time the payment was made to FCB.  The Code defines insolvency as follows:

---

[9]Answer at 2, (Adv. Case No. 11-00068EE), July 15, 2011.

[10]*Id.*  Pursuant to § 547(b)(4), for transfers made by a debtor to an "insider," a longer one-year reach back period applies.

[11]*Id.*

8

**§ 101.  Definitions**

. . . .

(32) The term "insolvent" means--

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of--

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title;

11 U.S.C. § 101(32)(A).  The Debtor is presumed to have been insolvent during the 90 days prior to the petition date.  11 U.S.C. § 547(f).  For the period between 90 days and one year, which applies to transfers to insiders, courts use a "balance sheet test."  Here, the transfer to Anthony, an insider, occurred on August 29, 2008, which is within one year before the Debtor filed its petition on June 9, 2009.

In his *Response Brief in Opposition to Plaintiff's Motion for Summary Judgment* (#33)[12] (Anthony's Responsive Brief), Anthony acknowledges that "[t]he uncontested facts show that the Debtor virtually always operated while 'balance sheet insolvent.'"[13]  Similarly, in addition to the statements in Anthony's Responsive Brief that the Debtor was insolvent, Anthony testified in his deposition that when the Debtor repaid the 2008 Loan on August 29, 2008, the Debtor's liabilities

---

[12]*Response Brief in Opposition to Plaintiff's Motion for Summary Judgment* (#33), (Adv. Case No. 11-00068EE), April 9, 2012.

[13]*Id.* at 7.

9

exceeded its assets.[14]  Anthony nevertheless asserts that since the Debtor had always operated *in the red*, the Debtor was not "insolvent" within the meaning of § 547(b)(3) at the time the payment was made to FCB because operating *in the red* was ordinary for the Debtor.  However, Anthony does not cite any cases to support his position that because it was business as usual for the Debtor to operate *in the red*, the Debtor was not insolvent at the time the 2008 Loan was repaid.  Therefore, the Court finds that Anthony has failed to show that a genuine dispute exists concerning the Debtor's insolvency at the time it repaid the 2008 Loan.

In summary, the Court finds that the Trustee has met his burden of demonstrating that no genuine issue exists as to any of the elements of § 547(b).  The payment by the Debtor of $175,000 in satisfaction of the 2008 Loan for Anthony's benefit is an avoidable preference as a matter of law unless Anthony has raised a genuine issue regarding whether the ordinary course of business defense bars the Trustee's recovery of the preference.

### B. Ordinary Course of Business Defense

In § 547(c) and § 547(h), there are exceptions to the general rule of avoidability of a preference under § 547(b).  Anthony asserts the ordinary course of business defense in § 547(c)(2).[15]  In Anthony's Motion, Anthony asserts an affirmative defense to the alleged preference that makes it non-avoidable.[16]  Likewise, in his brief, Anthony states that "[t]he material facts giving rise to the

---

[14]Transcript of Deposition, p. 74.

[15]The Court acknowledges that Anthony only addresses § 547(c)(2)(A) in his brief.  However, in Anthony's Motion, Anthony cites § 547(c)(2) as the basis for the relief he seeks.  The Court will give Anthony the benefit of having pled § 547(c)(2)(A) and (B).

[16]*Defendant's Motion for Summary Judgment* (#26) at 1, ¶ 2 (Adv. Case No. 11-00068EE), March 22, 2012.

10

claim and the ordinary course of business defense are not in dispute.  The dispositive question is simply whether, based on the applicable and controlling case law, the ordinary course of business defense applies to bar Plaintiff's recovery."  *Brief in Support of Defendant's Motion for Summary Judgment* (#28) at 5, (Adv. Case No. 11-00068EE), March 22, 2012.

Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer--

. . . .

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms;

11 U.S.C. § 547.

The 2005 amendments[17] to the Code made it easier for a creditor to successfully invoke the ordinary course of business defense.  Prior to the BAPCPA amendments, a defendant had to prove all three prongs of the ordinary course of business defense.  Post BAPCPA, the defendant must still prove that the transfer was "in payment of a debt incurred by the debtor in the ordinary course of business."  However, in addition, "the defendant need only plead and prove *either* that the transfer was made 'in the ordinary course of business or financial affairs of the debtor and the transferee' *or* that it was made according to 'ordinary business terms.'" 5 *Collier on Bankruptcy* ¶ 547.04[2] at 547-51 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012).

---

[17]Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pul. L. No. 109-8, § 409 (2005) (BAPCPA).

The ordinary course of business defense "'is intended to protect recurring, customary credit transactions' that are incurred and paid in the preference period for the purpose of encouraging the continuation of business by suppliers with a person seeking to avoid a bankruptcy filing. *G.H. Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co., LLC),* 439 F.3d 233, 240 (5th Cir. 2006); 5 *Collier on Bankruptcy* ¶ 547.04[2] at p. 547–51 (16th ed.2010)." *Goldberg. v. Graybar Elec. Co., (In re ACP Ameri-Tech Acquisition, LLC)*, 09-90082, 2012 WL 481582, at *7 (Bankr. E.D. Tex. Feb. 14, 2012). The burden of proving the ordinary course of business defense rests with Anthony. *Braniff Airways, Inc. v. Midwest Corp.,* 873 F.2d 805, 806 (5th Cir.1989).

The ordinary course of business defense requires that the repayment of the 2008 Loan be examined by a subjective test and an objective test. These tests were discussed in the recent case of *In re ACP Ameri-Tech Acquisition, LLC*. The bankruptcy court in *ACP Ameri-Tech* explained:

> Generically speaking, the subjective test examines whether the transfers at issue were "ordinary as between the parties" and the objective test examines whether the transfers were "ordinary in the industry." *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.),* 220 B.R. 1005, 1020 (B.A.P. 10th Cir.1998). After the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005, the transaction must satisfy either of the tests, but not both, in order to be protected from avoidance as a preferential transfer.

*In re ACP Ameri-Tech*, 2012 WL 481582, at *8 (footnote omitted).

In a footnote, the bankruptcy court further explained:

> The most-cited Fifth Circuit cases in this regard, *SGSM* and *Gulf City,*[18] *supra* were decided prior to the enactment of BAPCPA. Once BAPCPA amended the ordinary course defense in § 547(c)(2) to read the elements of the defense in the alternative, rather than the conjunctive, the portion of those opinions requiring satisfaction of both the subjective and objective tests is no longer applicable. *See Caillouet v. First Bank & Trust (In re Entringer Bakeries, Inc.),* 548 F.3d 344, 351 n. 9 (5th Cir. 2008).

---

[18] *[Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.),* 296 F.3d 363 (5th Cir. 2002)].

*Id.* at fn. 21 (footnote added).

The Court applies the subjective test first to determine whether the repayment of the 2008 Loan was "ordinary" as between the Debtor and Anthony.

### 1. Subjective Test

"There is no 'precise legal test' for [determining] whether payments are in the ordinary course of business"[19] of a debtor and a creditor. The Court must center its analysis on "whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent." *Lightfoot v. Amelia Maritime Svcs. Inc. (In re Sea Bridge Marine, Inc.),* 412 B.R. 868, 872 (Bankr. E.D. La.2008).

Generally, this analysis requires a creditor to establish a "baseline of dealing" between the parties. In order to establish a "baseline of dealing," a creditor must show a history of the transactions between the debtor and the creditor demonstrating that the payments made <u>during</u> the preference period were similar to the payments made <u>before</u> the preference period. When analyzing the history of the transactions between a debtor and a creditor, courts generally consider:

> four primary factors in connection with that data to determine the consistency of the conduct during that time frame: (1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) the circumstances under which the payment was made. 5 *Collier on Bankruptcy* ¶ 547.04[2][a][ii] at p. 547–54 (16th ed.2010).

*In re ACP Ameri-Tech,* 2012 WL 481582, at *8; *See also Friede Goldman Halter, Inc. v. Aircomfort, Inc. (In re The Consolidated FGH Liquidating Trust),* 392 B.R. 648, 660 (Bankr. S.D. Miss. 2008);

---

[19]*Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp.,* 158 F.3d 312, 317 (5th Cir. 1998)(citations omitted); *See also Sommers v. Concrete Straightline Sawing, LLC (In re Contractor Technology, Ltd.),* 2007 WL 4206211, at *2 (Bankr.S.D.Tex., Nov. 26, 2007).

*Torch Offshore, Inc. v. A & B Bolt & Supply, Inc. (In re Torch Offshore, Inc.),* 2009 WL 2849028, at *2 (Bankr. E.D. La. Feb. 19, 2009); *Compton v. Plains Marketing, LP (In re Tri-Union Development Corp.),* 349 B.R. 145, 150 (Bankr. S.D. Tex. 2006); *Bison Building Holdings, Inc. v. Tomball Forest, LTD. (In re Bison Building Holdings, Inc.),* 473 B.R. 168, 177 (Bankr. S.D. Tex. 2012).[20]

The Court will now look to see if there is a genuine issue as to the existence of a consistent "baseline of dealing" between the Debtor and Anthony prior to and during the preference period. This task requires the Court to consider several key factors in connection with the parties' business relationship. These factors, as mentioned previously include: (1) length of time of transaction, (2) amount or form of tender, and (3) unusual collection or repayment activity and circumstances of payment.

### a.  Length of Time of Transaction

Attached as Exhibit B to the *Response of H. Kenneth Lefoldt Liquidating Agent for Prevalence Health, LLC in Opposition to Michael L. Anthony's Motion for Summary Judgment* (#37) is Anthony's *Responses to Plaintiff's First Set of Requests for Admissions, Interrogatories and Requests for Production* (collectively, Anthony's RFA). In Anthony's RFA, Anthony admitted the

---

[20]The Court notes that while the Fifth Circuit has not formally adopted this four-part test, in its recent unpublished opinion of *In re Moye,* 2012 U.S. App. Lexis 17643 at *8 (5th Cir. Aug. 21, 2012), the Fifth Circuit affirmed the opinion of the district court "for substantially the same reasons as those set forth in the district court's thorough and well-reasoned Order. . . ." In its opinion, the district court used a very similar test in determining whether the ordinary course of business defense applied. The district court summed up the test it used as: "courts consider the timing of the payments, the amount and manner in which the transaction was paid, and the circumstances under which the transfer was made." *Cage v. Hardy Rawls Enterprises, LLC,* Civil Action No. H-10-956, *Order* (#25), p. 32, (S.D. Tex. Dec. 23, 2010).

following: that on January 28, 2008, he paid the Debtor $125,000,[21] and that on the next day, January 29, 2008, the Debtor signed a promissory note, payable on demand, in favor of Anthony in the amount of $175,000 with an interest rate of 7% per annum;[22] that on or about February 28, 2008, Anthony loaned the Debtor an additional $50,000, bringing the total amount paid by Anthony to the Debtor under the 2008 Loan to $175,000;[23] and that the Debtor paid FCB $175,000 on August 29, 2008, which satisfied the loan Anthony had obtained from FCB in order to fund the 2008 Loan.[24] Consequently, the length of time the Debtor and Anthony were engaged in the 2008 Loan was seven months and one day or 212 days.

Anthony made one other unsecured loan to the Debtor prior to the 2008 Loan. On February 27, 2006, the Debtor signed a promissory note in favor of Anthony in the amount of $200,000, payable on demand and bearing interest at 8% (2006 Loan). The 2006 Loan was repaid by the Debtor two months later or 61 days later on April 27, 2006, when the Debtor paid Anthony $201,333.05.[25] In comparison, the 2008 Loan was not repaid until 212 days later.

In *In re Torch Offshore,* the court applied the four factors and found that when compared to the timing of the payments made during the preference period, there was a significant difference in the timing of the payments to the creditor before the preference period. The court held that "[a]lthough it is only one factor, the extreme difference in the time period for payment by the debtor,

---

[21]Anthony's RFA, (#37-2), Admission No. 2.

[22]*Id.* at Admission Nos. 3 & 5.

[23]*Id.* at Admission No. 6.

[24]*Id.* at Admission Nos. 6 & 7.

[25]Anthony's RFA, (#37-2), Interrogatory No. 7; Transcript of Deposition, p. 33.

15

from an average of 80.6 days prior to the preference period and an average of 172.25 during the preference period, shows a significant enough difference in payment activity to outweigh the other factors."[26]  Therefore, the court found that the creditor had not met its burden under the ordinary course defense.

Like the court in *Torch Offshore,* the Court finds that in the case at bar, when comparing the time period for the payment made in the 2008 Loan with the time period for the payments made in the 2006 Loan, there is a significant difference in the time periods:  212 days versus 61 days. Consequently, the Court cannot find that Anthony has established a consistent "baseline of dealing" between the parties regarding the repayment of the 2008 Loan.

### b.  Amount or Form of Tender

As noted above, Anthony made one other unsecured loan to the Debtor during his five-plus years of employment with the Debtor.  The amount and form of repayment of the 2006 Loan differs considerably from the 2008 Loan.  The parties entered into the 2006 Loan on February 27, 2006, when the Debtor signed a promissory note in favor of Anthony in the amount of $200,000, payable on demand and bearing interest at 8%.

In order to fund the 2006 Loan, Anthony borrowed money from FCB in the form of two separate lines of credit.  The first loan had an interest rate which ranged from 7.50% to 7.75%; the second loan, from 8.00% to 8.25%.  When the Debtor paid an interest payment to Anthony in the amount of $1,553.05,[27] Anthony, in turn, paid this amount to FCB.  When Anthony made demand

---

[26]*In re Torch Offshore,* 2009 WL 2849028, at *3 (footnote omitted).

[27]Transcript of Deposition, Exh. 4, (Document 22-1), Exh. A p. 111.

16

on the note, the Debtor paid $201,333.05[28] directly to Anthony.  Anthony then used these funds to

pay off his two loans to FCB.   When added together (the interest payment and the final payment),

the total is more than the amount the Debtor owed Anthony under the terms of the 2006 Loan.[29]

In comparison, the 2008 Loan was also funded by a loan Anthony obtained from FCB.  The

2008 Loan was also an unsecured demand note for a total amount of $175,000 at the rate of 7% per

annum.  However, unlike the 2006 Loan, the proceeds of the 2008 Loan were paid to the Debtor in

two disbursements.  The first disbursement of $125,000 was given to the Debtor the day after the

note was signed.  The second disbursement of $50,000 was given to the Debtor a month later.

In August of 2008, Anthony made a demand on the Debtor for repayment of the 2008 Loan.

On August 29, 2008, a check was drawn on the Debtor's account for the principal amount of the

note, $175,000.  The Debtor's check was made payable to FCB.  Thus, unlike the 2006 Loan, the

Debtor made its payment of $175,000 directly to FCB to satisfy Anthony's loans at FCB.[30]

Because the Debtor made direct interest payments to FCB on Anthony's loan, Anthony

accepted less than what he was owed by the Debtor according to the terms of the 2008 Loan.  This

occurred because the loan Anthony had made with FCB carried a variable interest rate which

changed from 6.5% to 5%, and, therefore, the interest payments the Debtor made to FCB were based

on a lower interest rate of 6.5% to 5% and not the higher interest rate of 7% as stated in the 2008

Loan.[31]

---

[28]Anthony's RFA, (#37-2), Interrogatory No. 7; Transcript of Deposition, p. 33.

[29]Transcript of Deposition, p. 32-33.

[30]*Id.* at 40-45, and 71.

[31]*Id.* at 47, 83-86.

17

Unlike the majority of ordinary course of business cases, this case does not involve payments that were made by a debtor in a manner inconsistent with the express terms of a note or other financial arrangement,[32] but involves a single payment that was made by the Debtor to Anthony in accordance with the "payable on demand" terms of the note. However when the two loans are compared, the amount and the form of the tender differed in three important ways:

(1) The 2006 Loan was fully funded at or around the time the note was signed; however, the 2008 Loan was funded by Anthony in two disbursements, which were a month apart;

(2) The Debtor made payments directly to Anthony for the 2006 Loan and paid Anthony more than he was owed according to the terms of the 2006 Loan. As for the 2008 Loan, the Debtor made payments directly to FCB and paid Anthony less than he was owed according to the terms of the 2008 Loan; and

(3) When the Debtor repaid the 2006 Loan, it repaid principal and accrued interest. When the Debtor repaid the 2008 Loan, it repaid only the original principal amount of the loan, namely $175,000.[33]

Consequently, the Court cannot find that the amount or form of payment established an undisputed "baseline of dealing" between the Debtor and Anthony so as to show that the 2008 Loan was repaid in the ordinary course of business between the Debtor and Anthony.

---

[32]5 *Collier on Bankruptcy* at ¶ 547.04[2][a] at 547-55.

[33]As Anthony asserts, the Court acknowledges that the difference between the amount the Debtor paid and the amount the Debtor should have paid pursuant to the two notes is not a substantial sum of money.

18

### c. Unusual Collection or Payment Activity and Circumstances of Payment

Because the facts before the Court do not give rise to the typical debtor and creditor relationship where the creditor is an unrelated third-party and where the note requires payment in regular installments, the Court will combine the last two factors for determining a "baseline of dealing" and address them together.

"The court will normally compare the collection activities that preceded each challenged transfer with the pattern of collection activities occurring prior to the preference period to see if the collection activities that preceded the alleged preferences fall within that pattern."  5 *Collier on Bankruptcy* ¶ 547.04[2][a] at 547-56.

In the case at bar, there were no stereotypical "collection activities" because the 2006 Loan and the 2008 Loan were demand notes and because Anthony was an insider.   However, the Court finds that the circumstances under which the payment was made, a small corporation making payments to an insider, did give rise to unusual collection efforts and payment practices.

As president and chief operating officer of the Debtor, Anthony reviewed the Debtor's monthly financial statements which were prepared by the Debtor's comptroller.[34]   Therefore, Anthony knew the current financial status of the Debtor, knew whether the Debtor had "raised X amount of money,"[35] and, most important, knew when the time was right to make demand for payment from the Debtor.  In other words, Anthony knew when the Debtor had sufficient funds on hand to satisfy the 2008 Loan he had made to the Debtor.[36]  Tellingly, Anthony himself, rather than

---

[34]Transcript of Deposition, p. 92.

[35]*Id.* at 36, 52.

[36]*Id.* at 36.

the Debtor's comptroller, signed the $175,000 check.[37]

In his deposition, Anthony testified as to the circumstances surrounding the repayment of the

2008 Loan:

> My recollection is probably very similar to April 2006, you know. Probably had
> some sense that, you know, there was adequate monies in the cash account and
> casually – in a casual conversation one day said, oh, yeah, we've got that loan out
> there. That needs to be paid off, so let's pay it off. [38]

The Court finds that because of the small size of the Debtor and the positions of authority

Anthony held in the Debtor, the collection activities of Anthony were unusual. As the president and

board member of the Debtor, Anthony had intimate knowledge of the day-to-day affairs of the

Debtor. Therefore, unlike the employee in *In re Desktop Engineering Solutions Inc.*[39] who loaned

money to his employer in order to enable his employer to pay invoices, Anthony was in a position

not only to know when the Debtor had the funds on hand to pay him back, but also, as the president

and chief operating officer of the Debtor, to direct if and when the Debtor would repay the 2008

Loan. *See Hassett v. Goetzmann (In re CIS Corp.),* 195 B.R. 251, 259 (Bankr. S.D.N.Y.

1996)("[CEO] must be charged with the highest duty since he was the top ranking executive of [the

debtor], with the highest level of responsibility and compensation from the company.").

Consequently, the Court finds that Anthony has not shown the existence of a genuine issue

as to whether the preference met the subjective test, that is, that the payment of the 2008 Loan was

---

[37]*Id.* at 54-56.

[38]*Id.* at 52.

[39]*Desktop Engineering Solutions Inc. v. Ransom (In re Desktop Engineering Solutions Inc.),* 1994
WL 398369, 30 F.3d 1492 (5th Cir. 1994) (Not selected for publication in the Federal Reporter)
(Unpublished opinions issued before January 1, 1996, are precedent. 5th Cir. Local Rule 47.5.3.).

"ordinary as between the parties."  The Court will now look to see if Anthony can meet the objective test to show that the payment of the 2008 Loan was "ordinary in the industry."

## 2.  Objective Test

The objective test focuses on whether the payment arrangement conforms to ordinary business terms.  The Fifth Circuit addressed the objective test in *Gulf City Seafoods, supra*:

> Nearly all other circuits have held that a payment is "according to ordinary business terms" if the payment practices at issue comport with the standard of the industry. Under the holdings of these cases, the relevant inquiry is "objective"; that is to say, we compare the credit arrangements between other similarly situated debtors and creditors in the industry to see whether the payment practices at issue are consistent with what takes place in the industry.
>
> . . . .
>
> [W]e will follow all the other circuits and adopt an "objective" test for deciding whether a payment arrangement was made "according to ordinary business terms"; that is, the question must be resolved by consideration of the practices in the industry–not by the parties' dealings with each other.  Because "ordinary business terms" sets an outer boundary to the parties' practices, the ultimate question is simply whether a particular arrangement is so out of line with what others do that it fails to be "according to ordinary business terms."  We leave this case by case determination where it belongs–with the bankruptcy judge.  We only say that the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue.  Otherwise the practice cannot be considered an "ordinary" way of dealing with debtors.

*In re Gulf City Seafoods*, 296 F.3d at 367-69 (citations and footnotes omitted).

The Fifth Circuit went on to discuss how a court should define the industry whose standard should be used for comparison.  "In our view, for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product."  *Id.* at 369 (footnote omitted).

As Anthony testified in his deposition, the Debtor was in the business of providing various

health care benefits to individuals.  However, Anthony did not offer any evidence that in the health

care business, it is the industry standard for insiders to provide loans to his/her employer and for an

insider to dictate when the loans should be repaid.

The only proof Anthony does submit in support of his position that his 2008 Loan was the

standard in any industry is his own testimony in his *Affidavit of Michael L. Anthony*[40] (Anthony's

Affidavit).  In Anthony's Affidavit, Anthony states that he provided loans to two other companies

he had acquired as distressed companies.  Anthony then states that "[i]n my experience both as an

owner and as an employee, it is common for officers or principals of a small, privately-held company

to make loans to small companies."[41]  However, other than his own testimony, Anthony does not

offer any evidence to support his suppositions.  Nor does Anthony's Affidavit specifically discuss

the repayment of the 2008 Loan or explain how the circumstances regarding the repayment of the

2008 Loan are similar to the industry standard.

The Court finds that Anthony's conclusory, self-serving statements are insufficient to meet

his burden of producing evidence of an industry standard–in either the health care industry or any

industry for that matter.  *In re Bison Building,* 473 B.R. at 177.  *See Marshall v. East Coast Parish

Hosp. Serv. Dist.,* 134 F.3d 319, 324 (5th Cir 1998) (conclusory, unsupported statements are

insufficient); *See also Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.),* 463

B.R. 302, 306 (Bankr. D. Del. 2012) (conclusory allegation in a supporting affidavit was

"insufficient evidence to establish the ordinary course of business.").

The Court finds that Anthony has not met his burden under the objective standard which

---

[40]Anthony's Affidavit is attached as Exhibit 8 to Anthony's Motion.

[41]Motion, Exhibit 8, at 2, ¶ 3, *Affidavit of Michael L. Anthony* (#26-8).

would allow the Court to "satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue."[42]  Therefore, the 2008 Loan "cannot be considered an 'ordinary' way of dealing with debtors."[43]

Anthony relies on the unpublished opinion of *In re Desktop Engineering Solutions Inc.*[44] to support his position that repayment of the 2008 Loan was consistent with the ordinary course of dealing.  However, as noted previously, the Court finds that *Desktop Engineering* is factually distinguishable from the case at bar.  In *Desktop Engineering* an employee made two loans to the debtor; however, both loans were secured by a security agreement and both had a regular, monthly payment schedule.  In addition, the employee was simply a creditor of the debtor, not an insider.  As for the payments in question, the debtor made approximately eleven monthly payments to the employee in the year prior to filing bankruptcy.  The issue before the Fifth Circuit was whether the loan repayments were subject to the ordinary course of business exception, and thus, were not voidable preferences.  The Fifth Circuit found that the payments in question were consistent with the prior course of dealing between the parties: both notes were secured, and timely monthly payments were made by the debtor.  In addition, the trustee did not produce any evidence to contradict the employee's testimony that this type of financing was a customary alternative to other more traditional methods of financing used within the computer industry.  Consequently, the Fifth Circuit upheld the bankruptcy court's finding that the payments on the loan were incurred in the

---

[42]*In re Gulf City Seafoods*, 296 F.3d at 369.

[43]*Id.*

[44]As noted previously, *Desktop Engineering* was issued in 1994.  Unpublished opinions issued before January 1, 1996, are precedent. 5th Cir. Local Rule 47.5.3.

23

ordinary course of business between the employee and the debtor.[45]

As noted previously, the terms and payments of the two loans made by Anthony to the Debtor were not consistent as in *Desktop Engineering*. In addition, unlike the employee in *Desktop Engineering*, Anthony was an insider who had knowledge of when the Debtor had sufficient funds on hand to repay the 2008 Loan and had the authority to direct the repayment of the loan.

For these reasons and those stated above, Anthony did not meet the subjective test for establishing the ordinariness of the repayment. In addition, Anthony failed to meet the objective test because he failed to prove that the 2008 Loan was an industry norm. Consequently, unlike the employee in *Desktop Engineering*, Anthony has failed to meet his burden of showing the existence of an issue as to the ordinary course of business exception.

## CONCLUSION

In the Trustee's Motion, the Trustee asserts that there is no dispute as to any material fact; therefore, the Trustee is entitled to a judgment as a matter of law that the 2008 Loan is an avoidable preference. In Anthony's Motion, Anthony asserts that there is no dispute as to any material facts; therefore, Anthony is entitled to a judgment as a matter of law that the 2008 Loan is not an avoidable because of the ordinary course of business defense.

The Court agrees with both the Trustee and Anthony that there is no genuine issue of material facts. As noted above, Anthony concedes the facts that prove that the 2008 Loan was a preference as defined under § 547(b). Therefore, to survive the Trustee's Motion, the burden then shifted to Anthony to produce evidence creating a fact issue as to whether the 2008 Loan was repaid in the ordinary course of business under § 547(c)(2).

---

[45]*Desktop Engineering Solutions Inc.,* 1994 WL 398369, at *5.

The Court finds that Anthony has not met his burden of production that the 2008 Loan was made in the ordinary course of business as required under § 547(c)(2).  Therefore, the Court finds that Anthony's Motion is not well taken and should be denied.  The Court further finds that the Trustee's Motion is well taken and should be granted.  The Trustee is entitled to a judgment as a matter of law that the 2008 Loan is an avoidable preference under § 547(b) and that he is entitled to recover from Anthony the $175,000 payment under § 550(a)(1).

A separate judgment consistent with this opinion will be entered in accordance with Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure.

Edward Ellington
United States Bankruptcy Judge
Dated: November 7, 2012

25